IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON


MARY ANN WALKER,
on behalf of
Laverne G. Taylor, deceased,

     Plaintiff,

v.                              CASE NO. 2:07-cv-00411

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, filed by Laverne G. Taylor. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court is Plaintiff's Motion for Judgment on the Pleadings or in the alternative for remand, and Defendant's Brief in Support of Judgment on the Pleadings.[1]

---

[1]   The court reminds the parties that pursuant to Local Rule of Civil Procedure 9.4(a), the parties need not file motions in support of judgment on the pleadings (or for summary judgment).  Instead, Plaintiff should file "a brief in support of the complaint," while Defendant files "a brief in support

This case was originally filed by Laverne G. Taylor, who applied for both DIB and Supplemental Security Income ("SSI") benefits. Ms. Taylor (hereinafter referred to as "Claimant"), died on February 11, 2008. Mary Ann Walker was appointed as executrix, and substituted as Plaintiff (Order entered June 10, 2008, docket # 25). SSI benefits are not payable to an estate; accordingly that claim was dismissed. Id.

Claimant filed an application for DIB on June 7, 2005, alleging disability as of February 1, 2005, due to a variety of physical and mental impairments. The claim was denied initially and upon reconsideration. She requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 6, 2006, before the Honorable Harry C. Taylor, II. (Tr. at 424-54.) By decision dated September 26, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-27.) The ALJ's decision became the final decision of the Commissioner on June 1, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 5-7.) On June 28, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483

---

of the defendant's decision." Local Rules of the United States District Court for the Southern District of West Virginia, Local Rule of Civil Procedure 9.4(a).

F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2007).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the

claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2007).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore   v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16.)  Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of degenerative disc disease in the lumbar spine, panic disorder, and mood disorder.  Id.  The ALJ determined that the following claimed impairments were not "severe:" gastroesophageal reflux disease (GERD), history of ovarian cysts, rhabdomylosis [sic; rhabdomyolysis[2]], and carpal tunnel syndrome.  (Tr. at 16-18.)  At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 22.)  The ALJ then found that Claimant had a residual functional capacity for

---

[2] Rhabdomyolysis is "disintegration or dissolution of muscle, associated with excretion of myoglobin in the urine."  Dorland's Illustrated Medical Dictionary, 28th ed., at 1458 (1994).

light work, with a sit/stand option, reduced by exertional and nonexertional limitations.  Id.  As a result, Claimant could not return to her past relevant work.  (Tr. at 25.)  Nevertheless, the ALJ concluded that Claimant could have performed jobs such as stock checker, light security work, and mail clerk, which exist in significant numbers in the national economy.  (Tr. at 26.)  On this basis, benefits were denied.  (Tr. at 27.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d

5

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 48 years old at the time of the administrative hearing, and fifty years old when she died. (Tr. at 67.) Claimant completed the eighth grade, and earned a GED. (Tr. at 428.) In the past, she worked as a stock worker, cook, cashier, and home health attendant. (Tr. at 25.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, with special attention to the evidence relating to the period February 1, 2005 through September 6, 2006, and will address it as necessary with respect to the arguments of the parties.

<u>Plaintiff's Challenges to the Commissioner's Decision</u>

Plaintiff asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred (1) in failing to find that some of her conditions (bilateral carpal tunnel syndrome, lumbar discopathy L2-L5, lumbar facet syndrome, bilateral sacroiliac joint syndrome, sensory neuropathy, obesity, lower extremity edema, and borderline intellectual functioning) constituted severe impairments, (2) in determining Claimant's residual functional capacity, and (3) in concluding that Claimant could perform other work at step 5. (Pl.'s Br. at 6-7.)

6

The Commissioner argues that the Commissioner's decisions that Claimant's other impairments were not severe, that her residual functional capacity permitted a limited range of light work, and that she could perform other work, thus disqualifying her for DIB, are supported by substantial evidence.

Other Impairments Not "Severe"

The undersigned will address each of the conditions which Plaintiff contends constitute a "severe" impairment.   A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities."   20 C.F.R. § 404.1520(c) (2006); see also 20 C.F.R. § 404.1521(a) (2006); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard).   "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 404.1521(b) (2006).   Examples of basic work activities are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations;  and
> (6) Dealing with changes in a routine work setting.

### Bilateral Carpal Tunnel Syndrome

Plaintiff contends that the ALJ erred in his decision that her carpal tunnel syndrome was not a severe impairment.   (Pl.'s Br. at 9.)   The Commissioner responds that Claimant did not complain about

7

carpal tunnel symptoms at physical examinations following the surgery. (Def.'s Br., at 8.)

Claimant was seen at the Holzer Clinic on February 1, June 1, and August 30, 2005, and did not mention any symptoms relating to carpal tunnel syndrome. (Tr. at 297-300.) On October 10, 2005, she reported that both hands had "a numb like sensation over the last month." (Tr. 296.) Her grip strength was equal bilaterally, but she had a positive Tinel's sign[3] on the right, negative on the left." Id.

Claimant underwent a consultative physical examination by Ahmad M. Maraikayer, J.D. on September 1, 2005. Claimant did not report any symptoms consistent with carpal tunnel syndrome. (Tr. at 260-63.) The range of motion form for her forearms and hands were "normal." (Tr. at 264.)

On December 16, 2005, Dr. I. Derakhshan, a neurologist, evaluated Claimant and rendered an opinion of "lower back pain and features of carpal tunnel compression." (Tr. 354.) On January 10, 2006, he conducted EMG/nerve conduction studies and concluded:

> Upper extremities, severe bilateral carpal tunnel compression more intense on the left, which no signal could be obtained from any branch of the median nerves at the wrist. Ulnar and radial controls are normal. There is no significant delay across the elbow regarding the ulnar nerves.

---

[3] Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." Dorland's Illustrated Medical Dictionary, 28th ed., at 1527 (1994).

(Tr. at 349.)

In March and April, 2006, Claimant underwent surgery for carpal tunnel at Thomas Memorial Hospital (tr. at 395), but the records were not submitted to Social Security.  Medical records after the surgery contain no complaints from Claimant about her wrists and hands.

At the hearing on September 6, 2006, Claimant testified that she had numbness and pain in both hands, and that the surgery made them worse in that they ached all the time.  (Tr. at 439-40.) There is no medical evidence in support of this assertion.

### Lumbar Spine Impairments

Plaintiff asserts that the ALJ erred in failing to mention Claimant's L2-L5 discopathy, lumbar facet syndrome, bilateral sacroiliac joint syndrome, sensory neuropathy, and radiculopathy. (Pl.'s Br., at 9.)  The ALJ did, of course, recognize that Claimant's degenerative disk disease in her lumbar spine constituted a severe impairment, and reduced her physical residual functional capacity for that reason.  (Tr. at 18-20.)

The record contains treatment notes from the Holzer Clinic. On February 1, 2005, Claimant reported that she was employed as a caregiver.  (Tr. at 300.)  The assessment listed "[c]hronic low back pain with an L2-L3 disc herniation," for which she was prescribed Lortab 10/500 mg.  Id.  On May 24, 2005, Claimant had an MRI of her lumbar spine.  The findings were:

9

> There is mild scoliotic curvature of the lumbar spine
> convex to the right with the apex at L4. There is a
> small central right disc protrusion at L3-4 effacing the
> ventral thecal sac without significant central stenosis
> and a mild degree of right neural foraminal narrowing at
> this level. At L4-L5, there is a left lateral small disc
> protrusion narrowing the left L4-5 neural foramina.
> However, the exiting L4 nerve root exits without
> impingement on this exam. There is mild disc space
> height loss at L3-4 and 5. No other abnormalities are
> identified.

(Tr. at 311.) The impression was "[s]mall right central disc protrusion at L3-4 with small left lateral disc protrusion at L4-5 as above." Id. On June 1, 2005, Claimant received a refill of Lortab 10/500 for chronic pain. (Tr. at 299.) On August 30, 2005, Claimant asked the Holzer Clinic to complete a DHRR form concerning her ability to work, indicating that she was currently working part-time. (Tr. at 297.) The Lortab 10/500 was refilled. Id. The physician at the Holzer Clinic, Ryan Mennich, D.O., completed the DHHR form, indicated that Claimant was unable to work "because of ch[ronic low back pain with bilateral lower extremity radiculopathy and right lower extremity weakness], unable to find positions of comfort either sitting or standing." (Tr. at 310.)

Claimant told the consultative examiner on September 1, 2005, that she experienced "[l]ower back pain that radiates down both lower extremities, more on the right side." (Tr. at 260.) Dr. Maraikayer's assessment was that she had chronic low back syndrome, degenerative disk disease of the lumbar spine, and disk narrowing with slight scoliosis at the L5 level. (Tr. at 262.) An x-ray of

10

the lumbar spine showed "a slight degree of scoliosis, convex to the left," and "[m]ild degenerative type changes." (Tr. at 263.) The radiologist's impression was "[s]coliosis[4] with mild spondylosis[5]." Id.

A DDS non-examining physician, Marcel G. Lambrechts, M.D., reviewed Claimant's records on October 17, 2005, completed a physical residual functional capacity assessment, and concluded that she could perform light work, with occasional climbing, balancing, stopping, kneeling, crouching, and crawling. (Tr. at 315-16.) He noted that Dr. Mennich's statement on the DHHR form was "not fully supported by the physical and Xray reports in the file." (Tr. at 320.)

On November 17 and December 8, 2005, Claimant visited the Kanawha City Urgent Care facility complaining of back pain. (Tr. 344-45.) She was given Lortab one time. Id.

On May 12, 2006, a non-examining DDS expert, Dr. Rogelio Lim, reviewed Claimant's records, completed a physical residual functional capacity assessment, and concluded that she could perform light work, with occasional climbing, balancing, stopping,

---

[4]"Scoliosis" is "an appreciable lateral deviation in the normally straight vertical line of the spine." Dorland's Illustrated Medical Dictionary 28th ed., at 1497 (1994).

[5]"Spondylosis" is "1. ankylosis of a vertebral joint. 2. a general term for degenerative changes due to osteoarthritis." Id., at 1564. Lumbar spondylosis is "degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes." Id.

kneeling, crouching, and crawling.  (Tr. at 383-90.)  Dr. Lim noted that the report given to DHHR was "not fully credible."  (Tr. 389.) He commented as follows: "lack significant neuro findings.  Fully ambulatory and normal gait.  No radiculopathy and no myelopathy and normal neuro findings."  Id.

On May 15, 2006, Claimant was referred to the Cabell Huntington Hospital Regional Pain Management Center, upon her complaints of low back and right leg pain.  (Tr. at 392.)  On May 26, 2006, she underwent a physical examination at the Center, conducted by Dr. Ahmet Ozturk.  The impression was: lumbar discopathy by MRI, bilateral lumbar facet syndrome, bilateral sacroiliac joint syndrome, and myofascial pain syndrome.  (Tr. at 399.)  Dr. Ozturk recommended diagnostic blocks and therapeutic blocks, in addition to psychological evaluation.  Id.  He discontinued the Lortab prescription and started Claimant on methadone, 5 mg bid.  Id.  Claimant testified that she refused to take the methadone, and continued on Lortab.  (Tr. at 435.)  She also refused to undergo the "needles."  (Tr. at 436.)

On July 25, 2006, Claimant was examined at the Cabin Creek Health Clinic.  She complained of low back pain and right knee pain.  (Tr. at 417-18.)  An Xray of her right knee showed "[m]ild degenerative changes with probable small joint effusion."  (Tr. at 419.)

On August 21, 2006, Adam J. Breinig, D.O., a physician at the

12

Holzer Clinic, partially completed a DHHR form, which indicates his opinion that Claimant could not work due to radiculopathy and right lower extremity weakness.  (Tr. at 402-03.)

At the hearing on September 6, 2006, Claimant testified that she experiences lower back pain constantly, with pain radiating down her legs, worse on the right side.  (Tr. at 436.)  She indicated that she cannot stoop, kneel, crouch, or crawl.  Id.

The ALJ's decision devotes two single-spaced pages to a thorough discussion of Claimant's back impairment, and the medical evidence relating to it.  Although the ALJ may not have mentioned each medical term used to describe her symptoms, it is clear that he credited her with having a severe impairment relating to her lumbar spine with associated radiating pain.  Claimant has not shown that the ALJ failed to consider any of the medical records relating to her back impairment.

### Obesity

Plaintiff contends that the record is replete with references to Claimant's obesity and that it was error for the ALJ not to discuss it.  (Pl.'s Br. at 11.)  The Commissioner responds that there are few references.  (Def.'s Br. at 11.)

On September 1, 2005, Claimant was five feet, five inches tall, and weighed 204 pounds; she was considered to be obese.  (Tr. at 260-61.)

Claimant's weight gradually increased from February 1 to

13

October 10, 2005, as reported by the Holzer Clinic.  (Tr. at 296-300.)  The Clinic's records, and other medical records from other sources, do not reflect any complaints or treatment concerning her obesity during this period.  Claimant did not testify as to any complaints about her weight and its effect on her ability to work.

### Lower Extremity Edema and Sensory Motor Neuropathy

Plaintiff argues that Claimant's visit to St. Francis Hospital and the impression of Dr. Ozturk suggest additional severe impairments.  (Pl.'s Br. at 11.)

The consultative examiner reported on September 1, 2005, that Claimant's lower legs had "[n]o ankle edema, digital clubbing, or cyanosis."  (Tr. at 261.)

The Holzer Clinic made no note of lower extremity edema during the period February 1 through October 10, 2005.  (Tr. at 296-300.)

On October 29, 2005, Claimant was treated at St. Francis Hospital, complaining of swelling feet for the past four days.  She received Lasix and was discharged the next day.  (Tr. 323-43).

As noted above, on December 16, 2005, Dr. I. Derakhshan, a neurologist, evaluated Claimant and rendered an opinion of "lower back pain and features of carpal tunnel compression."  (Tr. 354.) On January 10, 2006, he conducted EMG/nerve conduction studies and concluded, with respect to Claimant's legs:

> Lower extremities, sural latencies are bilaterally prolonged.  Conduction velocity of the left tibial nerve falls at the lower limit of normal, indicating the presence of a sensorimotor neuropathy.

14

(Tr. at 349.)

On May 26, 2006, the examiner at the Cabell Huntington Pain Center, Dr. Ahmet Ozturk, found no joint swelling, edema, ecchymosis, cyanosis, scars or varicose veins in Claimant's legs. (Tr. at 398.)  There was no restriction or pain in moving the legs, no obvious muscle weakness or wasting, reflexes were 2+ and symmetrical.  Id.

Medical records after December, 2005 contain no mention of symptoms associated with Claimant's legs.  At the hearing, Claimant did not mention any trouble with her legs, other than the pain radiating as a result of her low back syndrome.

### Mental Impairments

The ALJ found that Claimant had the severe mental impairments of panic disorder and mood disorder.  (Tr. at 16.)  Plaintiff does not dispute the identification of Claimant's mental impairments; she challenges the level of severity and asserts that Claimant's condition was as described by Sheila Kelly, at Exhibit 23F, and not as described by Lisa Tate, Exhibit 5F.  (Pl.'s Br. at 12.)  She notes that the ALJ did not refer to the statement of Claimant's treating psychiatrist, Dr. Braun.  Id.

The Commissioner responds that the ALJ's decision as to the severity of Claimant's mental impairments was supported by substantial evidence, was not wholly dependent on the report of Ms. Tate, and appropriately did not rely on Dr. Braun's unsupported

15

conclusion.  (Def.'s Br. at 11.)

The report from Lisa Tate is dated June 25, 200<u>3</u>, not 200<u>5</u>, as reported by the ALJ.  (Tr. at 228, 20.)  Thus the report was written nineteen months <u>before</u> Claimant's date of onset, and should be given limited weight.  The same is true as to the Psychiatric Review Technique Form completed by non-examining DDS experts Debra Lilly, Ph.D (July 21, 2003), affirmed by Rosemary Smith, Psy.D. (November 17, 2003) (Exhibit 7F).

The psychological evidence of Claimant's mental impairments since the date of onset consists of a consultative evaluation by Paula J. Bickham, Ph.D. on September 15, 2005 (Exhibit 10F), a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment ("Mental RFC") form completed by DDS non-examining expert Jeff Harlow, Ph.D. on September 29, 2005 (Exhibit 11F), a Psychiatric Review Technique form completed by DDS non-examining expert Debra Lilly, Ph.D. on April 21, 2006 (Exhibit 18F), an evaluation by Sheila Kelly, M.A. on August 25, 2006 (Exhibit 23F), and a two-sentence statement of Dr. Nohl Braun, dated September 7, 2006, with no treatment records in support (Exhibit 24F).

Dr. Bickham did not administer any psychological tests to Claimant, and conducted a clinical interview and mental status examination.  (Tr. at 268-75.)  She reviewed Ms. Tate's 2003 evaluation.  (Tr. at 270.)  Dr. Bickham reported as follows:

16

| | |
|---|---|
| Concentration | Mildly deficient |
| Persistence | Moderately deficient |
| Pace | Mildly deficient |
| Immediate memory | Within normal limits |
| Recent memory | Mildly deficient |
| Remote memory | Moderately deficient |
| Social functioning | Within normal limits |

(Tr. at 273-74.)  Her diagnoses were: alcohol dependence (early full remission), panic attack without agoraphobia, and mood disorder due to herniated discs with chronic back pain with depressive features.  (Tr. at 274.)

Dr. Harlow reviewed both Ms. Tate's and Dr. Bickham's reports and concluded that Claimant had an anxiety-related disorder with recurrent severe panic attacks.  (Tr. at 282.)  He opined that her restriction of activities of daily living were mild, her difficulties in maintaining social functioning were mild, her difficulties in maintaining concentration, persistence or pace were moderate, and she had no episodes of decompensation of extended duration.  (Tr. at 287.)  On the Mental RFC, Dr. Harlow indicated that Claimant was moderately limited as to the following abilities:

- remember locations and work-like procedures
- understand and remember detailed instructions
- carry out detailed instructions
- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
- complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.

(Tr. at 291-92.)  Her other abilities were "not significantly limited."  Id.  In his comments, he wrote: "Although this

17

claimant's substance abuse and panic disorder mental impairments show some limitations in specific capacities as denoted in [the Mental RFC], it is concluded that the claimant can perform repetitive work-related capacities because these limitations are moderately limited or less." (Tr. at 293.)

Dr. Lilly also reviewed Ms. Tate's and Dr. Bickham's reports. (Tr. at 380.) She concluded that Claimant's mental impairments were not severe (tr. at 368), although she had depression and panic attacks (Tr. at 371, 373). She rated Claimant's restrictions as less severe than Dr. Harlow (mild/mild/mild/none). (Tr. at 378.) She commented as follows:

> The claimant is seen as credible. She makes no complaints at this time of concentration or memory problems and the recent neurological examination finds none. She reports that her limitations are related to her pain, and makes no allegations of limitations related to a mental disorder. She has no recent notes from her previous treating source who contends that the depression contributes to her disability, despite the fact that he notes normal psychiatric examination, the fact that she is caring for a 4 year old, and was working part time at the time that he made this statement. With the new evidence in file [the report from Dr. Derakhshan], there is no indication of severe functional limitations related to a mental disorder.

(Tr. at 380.)

Sheila Kelly evaluated Claimant on August 25, 2006, and administered various psychological tests and conducted a clinical interview. (Tr. at 405.) Several of the tests were deemed to be invalid due to Claimant over-endorsing items "in a pathological direction." (Tr. at 410-11.) Ms. Kelly's diagnostic impression

18

was: history of Lortab, Xanax, and Soma abuse (denied by Claimant), history of alcohol abuse (in remission by self-report), possible pain disorder associated with general medical condition and psychological factors, borderline intellectual functioning (estimated), and borderline personality disorder versus personality disorder (not otherwise specified, with dependent, avoidant, passive-aggressive, and borderline features).  (Tr. at 412.)

Ms. Kelly assessed Claimant as "poor" in her abilities to understand and remember detailed instructions, carry out detailed instructions, and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 413-14.)  She rated Claimant as "fair" in her abilities to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, make simple work-related decisions, complete a normal workday or workweek, perform at a consistent pace, interact appropriately with the public, maintain socially appropriate behavior, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independent of others.  _Id._  Ms. Kelly considered Claimant to be "good" at the ability to remember locations and work-like procedures, understand and remember short, simple instructions, carry out short, simple instructions, sustain an ordinary routine without special supervision, ask simple questions or request assistance, maintain socially appropriate behavior, adhere to basic

19

standards of neatness and cleanliness, respond appropriately to changes in the work setting, and be aware of normal hazards and take appropriate precautions.  <u>Id.</u>

Dr. Nohl Braun submitted the following statement, dated the day after the hearing:

> I, Dr. Nohl Braun, have reviewed the Report of Psychological Evaluation and Medical Source Statement of Ability to do Work-Related Activities (Mental) form completed by Sheila Emerson Kelly, M.A. dated 8/25/06. Based upon my treatment of the claimant, I concur with the findings of Ms. Kelly.

(Tr. at 421.)  The court notes that the record lacks any evidence of the treatment relationship of Dr. Braun and Claimant.  He did not submit any treatment notes, narrative, test results, or other indicia of the extent of his knowledge of Claimant.  In the absence of any evidentiary support, it was appropriate for the ALJ to disregard Dr. Braun's statement.  20 C.F.R. § 404.1527.

The ALJ concluded that Claimant had mild restriction in her activities of daily living (consistent with Exhibits 11F, 18F), mild difficulties in maintaining social functioning (consistent with Exhibits 11F, 18F), moderate difficulties in maintaining concentration, persistence, or pace (consistent with Exhibit 11F), and no episodes of decompensation of extended duration (consistent with all evidence).  Neither Ms. Tate nor Ms. Kelly characterized Claimant's abilities in these four categories.

Based on the foregoing, the undersigned proposes that the presiding District Judge **FIND** that the Commissioner's decision

regarding Claimant's impairments which were "severe," and the severity of her mental impairments was supported by substantial evidence.

Residual Functional Capacity ("RFC")

Plaintiff argues that the ALJ based his assessment of Claimant's physical RFC on the reports of the non-examining DDS experts, and her mental RFC on the reports of the consultative examiners, Ms. Tate and Dr. Bickham.  (Pl.'s Br. at 17.)  She contends that neither assessment is supported by substantial evidence.  The court will address the physical and mental RFC separately.

## Physical RFC

In a four-page paragraph, Plaintiff asserts that the findings of the non-examining DDS experts, Drs. Lambrechts and Lim, were incomplete, inaccurate, and inconsistent; thus the ALJ should not have based his RFC on their assessment that Claimant could perform work at the light exertional level.  (Pl.'s Br. at 17-21.)

The Commissioner responds that the ALJ cited to all the evidence relating to her back impairment, noted Claimant's testimony that her pain was controlled by medication, and found Claimant to be partially credible with respect to her complaints.  (Def.'s Br. at 12-14.)  He argues that the ALJ's physical RFC is supported by substantial evidence.

At steps four and five of the sequential analysis, the ALJ

must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The ALJ gave the opinions of Drs. Lambrechts and Lim "significant weight," finding them to be consistent with the objective medical evidence. Upon careful consideration of the entire record, the court is persuaded that the ALJ accurately characterized the extent of Claimant's impairment and appropriately concluded that she was capable of performing work at the light exertional level.

### Mental RFC

Plaintiff contends that the ALJ should have given controlling weight to Ms. Kelly's report and Dr. Braun's statement because of their recency and their treating relationship with Claimant. (Pl.'s Br. at 23.)  The court has already addressed Dr. Braun's statement and the little weight it deserves.

The ALJ determined that Claimant's mental RFC included "moderately deficient remote memory and mildly deficient recent memory, mildly deficient concentration and pace and moderately deficient persistence, and she has difficulty accepting criticism from authority figures." (Tr. at 22.)  These limitations were taken from Dr. Bickham's evaluation, Dr. Harlow's Mental RFC, and Ms. Kelly's comment that Claimant would have difficulty responding appropriately to criticism from supervisors.  The court notes that these limitations are greater than those listed by Ms. Tate; thus the ALJ did not rely on Ms. Tate's report to a significant extent.

### Pain

23

Plaintiff contends that the ALJ did not properly assess Claimant's complaints of pain and her non-exertional impairments, consistent with Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). She argues that the ALJ erred in not crediting Ms. Kelly's report and Claimant's statements as to her own abilities.

A two-step process is used to determine whether a claimant is disabled by pain. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged. 20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated. Craig, 76 F.3d at 595. When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are

24

reasonably consistent with objective medical and other evidence.

20 C.F.R. § 404.1529(c)(4) (2006).  Additionally, the regulations

provide that:

> [w]e will consider all of the evidence presented,
> including information about your prior work record, your
> statements about your symptoms, evidence submitted by
> your treating, examining, or consulting physician or
> psychologist, and observations by our employees and other
> persons. . . . Factors relevant to your symptoms, such
> as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and
> intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side
> effects of any medication you take or have taken to
> alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or
> have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve
> your pain or other symptoms (e.g., lying flat on your
> back, standing for 15 or 20 minutes every hour, sleeping
> on a board, etc.); and
>
> (vii) Other factors concerning your functional
> limitations and restrictions due to pain or other
> symptoms.

20 C.F.R. § 404.1529(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there
> is an underlying medically determinable physical or
> mental impairment(s)--i.e., an impairment(s) that can be
> shown by medically acceptable clinical and laboratory
> diagnostic techniques--that could reasonably be expected
> to produce the individual's pain or other symptoms. * *
> * If there is no medically determinable physical or

25

> mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186, at *2. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical

26

evidence of the pain itself. <u>Craig</u>, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. <u>Craig</u>, 76 F.3d at 595. Nevertheless, <u>Craig</u> does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which <u>Craig</u> prohibits is one in which the ALJ rejects allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

The ALJ determined that Claimant had produced evidence of a medically determinable impairment that could cause reasonably be expected to produce the alleged symptoms. (Tr. at 23.) The ALJ proceeded to the second step in the pain analysis, and his decision states that Claimant's descriptions of her daily activities were inconsistent as between what she told the evaluators and what she stated under oath at the hearing. (Tr. at 23-24.) On this basis, he found her not to be entirely credible. (Tr. at 24.) The court notes that Ms. Kelly also found Claimant not to be credible, particularly in her responses to the psychological test questions,

which were "pathological." (Tr. at 411.)

The ALJ explained that the objective medical evidence did not fully support Claimant's subjective complaints, noting that the non-examining DDS experts concluded that Claimant could perform light work. (Tr. at 24.)

The ALJ considered Claimant's subjective complaints and recited them at some length in his decision. (Tr. at 22-23.) He noted Claimant's testimony of pain 24 hours a day, seven days a week, exacerbated by staying in one position too long, or by increasing her activity. (Tr. at 22.) The ALJ acknowledged that Claimant's medications included Lortab, which eased her pain. Id.

The ALJ's pain and credibility analysis is thorough and well reasoned and is supported by substantial evidence of record, and the court proposes that the presiding District Judge so find.

The court further proposes that the presiding District Judge find that the ALJ's pain and credibility analysis is consistent with the applicable regulation at 20 C.F.R. § 404.1529(b) (2006), and Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (July 2, 1996), and is supported by substantial evidence.

It is apparent that the ALJ carefully considered all the physical and psychological evidence in the record and exercised his sound judgment in evaluating the same and reaching his conclusion as to Claimant's physical and mental residual functional capacity. The undersigned proposes that the presiding District Judge **FIND**

that the ALJ's decisions in these regards are supported by substantial evidence.

Hypothetical Question

Plaintiff asserts that the ALJ failed to provide the vocational expert with a hypothetical question which included all of Claimant's relevant impairments. (Pl.'s Br. at 27.) In particular, Plaintiff complains that the question did not include the following: mild bilateral carpal tunnel symptoms, multiple herniated discs at L2 through L5, continuous back pain and bilateral radiculopathy, restricted lumbar range of motion, an inability to stand, walk or sit for prolonged periods of time, obesity, and edema in the lower extremities, and all the limitations found in Ms. Kelly's report. Id. at 29.

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity." Id. at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that

are supported by the record.  See Chrupcala v. Heckler, 829 F.2d
1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question
may omit non-severe impairments, but must include those which the
ALJ finds to be severe.  Benenate v. Schweiker, 719 F.2d 291, 292
(8th Cir. 1983).

The hypothetical question, in addition to the usual components
of age, education, prior work experience, training, etc., included
the following:

> herniated disc in the lumbar spine creating back pain
> going into both legs, worse on the right than on the left
> with a need to alter her position, sitting, standing,
> walking on occasion.  She apparently suffers from panic
> . . . disorder with panic attacks occurring at the rate
> of approximately one or slightly more a week.  Probably
> lasting a better part of a half hour, leaving her with
> tiredness thereafter.  She apparently suffers from a mood
> disorder, which is apparently due to the chronic back
> pain. * * * [I]nsight was mildly impaired, judgment was
> mildly impaired, concentration was mildly impaired,
> persistence was moderately deficient.  Pace was mildly
> deficient.  Recent memory was mildly deficient.  Remote
> memory was moderately deficient.  Now in conjunction with
> intellectual functioning, apparently the best estimate is
> the borderline ring [sic; range].  Apparently she reads
> about the sixth grade level.  Historically, she's had
> some difficulties with authority.  And so there would be
> difficulty in relating to and accepting criticism from
> authority figures.  She'd be precluded from prolonged
> periods of standing, prolonged periods of walking.  She
> could probably only occasionally do postural limits or
> bending, stooping, kneeling, crouching and crawling.
> She'd be prohibited from working around unprotected
> heights and moving machinery. * * * [The pain is] at
> least mild, perhaps sometimes worse than that.

(Tr. at 449-50.)

Despite the extensive limitations set forth in the
hypothetical question, the vocation expert identified more than a

30

million jobs nationwide and more than 9,000 jobs in the region which Claimant could have performed, all at the light or sedentary level. (Tr. at 450-51.) When the ALJ added a limitation due to mild bilateral carpal tunnel syndrome, the number of jobs was reduced by no more than 30 percent, with perhaps another 20 percent reduction if the syndrome were moderate rather than mild. (Tr. at 451.)

It is clear that the ALJ included many of the limitations which Plaintiff asserts he omitted. The undersigned proposes that the presiding District Judge **FIND** that the hypothetical question posed to the vocational expert by the ALJ included all the relevant severe and non-severe impairments supported by the record which would have affected Claimant's ability to perform work, and that the decision denying benefits is supported by substantial evidence.

Recommendation

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge DENY the Plaintiff's Motion for Judgment on the Pleadings or in the alternative, Remand the Case to the Commissioner, AFFIRM the final decision of the Commissioner, and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section

31

636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit the same to counsel of record.


_____July 11, 2008_____
          Date

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge

32